May it please the Court. My name is Dan Bonnett and I represent the Plaintiff Appellant Aimee Greene and I'd like to reserve two minutes, if I may, for rebuttal. I'd also like to begin by saying I too have a summer cold. Mine has taken up residence in my vocal cords and up until two days ago I had no voice so I don't ordinarily sound like a member of the cast from the Little Rascals. I usually have a different voice. So please bear with me and I hope you'll be able to understand the points that I'm trying to emphasize. I also cough once in a while and so if that happens again I apologize in advance. You're thoroughly sympathetic. Thank you. Thank you. This case, Your Honors, raises a number of interesting issues. Probably the most important from the plaintiff's perspective has to do with whether there's sufficient evidence that was presented to the District Court to demonstrate the existence of pretext for purposes of this case. And I'd like to emphasize something that Justice Breyer said in the Burlington Northern Santa Fe Railroad v. White case and that is context matters and in this case it particularly matters given the history of what we put forth in the record about the discrimination that has taken place both historically in the firefighting services and more particularly at the Buckeye Valley Fire District. Counsel, let me, again, I'm only obviously speaking for myself. There are only two areas in which I had going in a disagreement with your position. One is that there were some discrete claims that were held to be time-barred and that seemed to me a correct application of Morgan. But the one that I'd like you to talk about is the application for the captain position as distinct from the other positions. And specifically, what difference does it make to your argument that it was actually a different decision-maker involved and that the other people chosen for captain had actually been acting captains? And I know that there's a claim that she should have been an acting captain, but in fact she never got to that point. So it seems a little bit more attenuated and I'd appreciate your addressing that. Sure. Thank you, Judge Graber. First of all, we don't believe any of the claims are time-barred under the 1983 claim. There's a two-year statute of limitations that applies and we think the district court overlooked the application of the appropriate limitations period under the 1983 claim. And although the Title VII analysis still applies, there is a different period of time that we think captures the time within which those claims would be relevant. Secondly, even under Morgan, the evidence of the prior animus certainly is admissible. Oh, it's admissible. Certainly. That's a different question, though, a little bit than whether it's directly actionable. Sure. And then to the degree that there has been different decision-makers, we think that that's genuinely a fact that's in dispute here. We had evidence in the record where Chief Bembo said, well, it really was Chief Alexander who was making the decision. And then we had testimony from Chief Alexander saying, well, it really was the two of them together. And then they both said, well, they really wanted to have another assessment center decision made, but that really was done by the board. The board said no. But there never really was a clear indication, at least we believe in the record, that there could not have been this internal assessment center conducted in which Ms. Green would have had another opportunity to be considered for the purpose of the court. Who is the board of the fire department? The board is the, and I defer to Mr. Hathaway to get the number correct, but it essentially are the elected individuals that oversee the fire district. The fire district is a taxing body. That's how it raises its revenues. And so they sit on the board. But at least in terms of the day-to-day operations and almost all the decisions, we think the board was more of a rubber stamp. I would be hesitant to use that term, but I certainly think the record could allow the jury to make that conclusion, that they did not make an independent assessment. They probably, I think, from the record, Judge Gilman could be more interested in making sure that they didn't operate in a deficit, that the bills got paid and that they approved the bills as they came in and that they took the action that ordinarily would be taken, but they did not appear to be involved in the type of personnel decisions that ordinarily we find in a Title VII or a 1983 equal protection claim. Well, let me ask you this. There are three facts, I think, that I got from the record that sort of hurt your position and I want you to comment on. One is that, first of all, the plaintiff's life partner, this Christine Capitino, is that her name? Yes. Was promoted to a full-time firefighter. Secondly, Chief Alexander encouraged your client to take the captain's exam. And finally, your client herself was offered a full-time firefighter position just before she resigned. Sure. So those facts don't help your position, do they? Well, I think a jury could factor those three things in light of the context of all the other evidence and come up with this conclusion. First of all, Ms. Capitino, although she was made a full-time firefighter, it didn't happen until much later in the process after there had been these other instances that had been raised by other female firefighters in the district about discrimination. My client was not the only one who challenged the policies of the Buckeye Valley Fire District as being discriminatory based on gender bias. Secondly, with regard to Chief Alexander, he did initially out of the gate encourage Ms. Corrine, and that's not disputed, to take the captain's exam. But we used the term backdraft in our opening brief to describe what, which in the fire services has a particular meaning. It means that when there's a change in the environment, I don't know if you remember the movie Backdraft, but when there's a change in the environment, then there is an implosion and then an explosion of flame. And in this particular case, I don't think Chief Alexander expected the backdraft from the male firefighters who clearly made it very, very clear about what their sentiments were with regard to taking orders from any female. And the record is peppered with a number of statements from these same people who had direct input into the decision-making process about what they thought about women in the fire service and not taking orders from anyone who would be a female in a captain's position. Finally, with regard to the last point that you raised, Judge Gilman, with regard to finally making the offer, it's undisputed that that offer was made to ten people before it was made to Ms. Green. All of them turned it down for the same reason that Ms. Green turned it down, and that was there was questions about whether or not it was in fact a permanent full-time firefighter position, that it was tied to a budget that placed the person on a rescue vehicle as opposed to being on a fire engine. And again, when you take into consideration the other testimony about the difference between women being assigned to rescue to ambulances and not getting time on the engine, not getting engine time, which would then determine the ability to advance more rapidly, that Ms. Green would have been doing nothing more than taking the same type of subservient position that she had been given as a reserve firefighter. So those three facts we think the jury can certainly take into consideration, but draw inferences from them at trial that it doesn't overcome the discriminatory animus that existed within the department, and it doesn't overcome the male firefighters in deciding how they were going to create these prioritized hiring lists, which are purely subjective. The record is very, very clear that there was no established criteria for coming up with these prioritized hiring lists. Chief, Italian Chief Lee has even described that his only instruction in putting these lists together was to rack and up than what a number of people, both male and female, within the department described as a popularity contest. In fact, Chief Lee's, I believe, also made the comment that, look, we just wanted to see who we thought could get along the best with everybody else on the crew. We can teach firefighting to anybody. Well, that's not the written policy that the jury is supposed to be using to determine who gets hired and who doesn't get hired. You know, I notice the record shows that your client's popularity, if you want to call it that, on that list dropped over time. Now, if, in fact, the basis for discrimination was gender discrimination, why would she drop? She would drop because, as many, many of the people said, and the record, again, is very clear on this in a number of points, they got tired of her complaining, complaining about how she was being treated. And so it's certainly, a jury could infer, retaliatory motive in saying, you know, we're getting tired of Ms. Green raising these issues all the time. In fact, Chief Alexander's wife, Karen Alexander, who also worked in the administrative position in the department, said that when they had these social gatherings at the Alexander's home, all of the chief's wives were getting tired of Amy bringing up all these issues about mistreatment. Well, retaliatory, certainly, if you want to make sure that somebody isn't going to be considered for the next round of promotions, you lower them on the list because you don't like the fact that they're continuing to raise these issues. Certainly, there's enough in the record from which a jury could make that inference and draw those conclusions. And unfortunately for my client, we believe where the district court erred was in weighing that evidence and coming up with a conclusion about where this may ultimately wind up rather than recognizing that at least at the summary judgment stage, that's for the trier of fact to make that determination, not for the court. The only other point I think I'd like to make at this juncture and reserve the rest of my time, if I may, is the notion that there was some statistical information that was presented and there was some discussion about the fact that really the statistical information was not fully developed and there wasn't a sufficient amount of information that was presented to determine how many females actually had applied that had not been hired. And certainly, we are not suggesting that this case is one that stands on statistics alone, but as was recognized in the Warren v. City of Carlsbad case that we cited, certainly it is a factor that can be taken into consideration. That case involved a firefighter in the city of Carlsbad, very similar to the situation of Ms. Green, who was passed over for promotion. And the court looked in that case at statistical evidence and said it is a factor that can be taken into consideration in determining whether there's enough evidence to demonstrate pretext. I would like to reserve the remainder of my time. You may do that. We'll hear next from Mr. Hathaway. Your Honors, good morning. I'm Milton Hathaway. I represent the defendants, the Buckeye Valley Fire Department, also known as the Buckeye Valley Fire District, and two of their chiefs, the fire chief, Scott Benbow, and the assistant chief, Mr. Alexander, Chief Alexander. To answer Judge Gilman's question about the board, there is an elected board. It's either three or five people. I'm not sure. I don't meet with them. I met with the chief. But what they do is they work with the chief mostly on budget-type issues, dollar-type issues. The chief typically puts together a budget, and then the board oversees and makes sure. And so there is a financial interest there. And, Judge Graber, you asked about the different decision-makers. And I want to back up a little bit in the McDonnell-Douglas analysis and just make sure I cover what the plaintiff asserted were some unbelievable claims when the district, and the defendants in this case, asserted certain reasons which were nondiscriminatory for their conduct. Well, let me clarify the one thing that does concern me, and that is, with respect to the captain positions, as distinct from the full-time firefighter and acting captain decisions, is Mr. Bonnet correct or incorrect in stating that the record is not completely clear as to who made those decisions, or if it is clear, who made the decisions? The decisions, according to Chief Alexander, when he was deposed, are decisions that he and Chief Benbow make together. They meet in terms of decisions. And with respect to the captain positions specifically, Chiefs Benbow and Alexander would have made the decision with respect to the acting captain positions after the assessment center in November of the union came to them and asked for Mr. Medina to be put into the vacant full-time position. They didn't have a decision. In fact, the board made a decision contrary to what their wishes were with respect to the move of the acting captains into the full-time captain position. And the evidence is fairly clear, and it's in the excerpt to record. And our position is that with respect to all of those, there were nondiscriminatory reasons that are not unbelievable that were provided, and then again ‑‑ I think that counsel agrees that they're at the third step. That is, that the question for us is whether there is sufficient evidence giving inferences to the plaintiff of pretext that the nondiscriminatory reasons given were pretextual. So I think we're all on the same page that that's the locus of the conversation. In the brief, there were issues raised by the plaintiff. And I just want to make sure, if it's conceded today that that's where we are, then in terms of the issues on pretext, the plaintiff has raised a number of different issues on pretext. One is that our system is subjective in terms of promoting full-time firefighters into the firefighter position. That, in addition, the union might have some involvement. That, you know, in terms of the subjective, the cases in this district, like the Jeregi case, where they talk about ‑‑ Can I jump in? Sure. I think there's a different analysis in my mind between the acting captain and captain positions versus the full-time firefighter positions, right? Because that's where this highly subjective ‑‑ I don't know if it's accurate to call it a popularity contest or not, but what I understand your client to say is that, well, look, we didn't discriminate against her in refusing to promote her to full-time firefighter. We just went off the list. But I think what the argument on the other side, which has some traction with me, is that, well, the formation of those lists, that fact itself became a vehicle for the discriminatory animus motivating a lot of male firefighters within this department got to be, you know, that sort of got translated into the decision‑making process, and it kind of invalidates the nondiscriminatory basis for that reason for not promoting her. So that's what I would be interested in hearing from you, Justice. And what you need to do is to closely scrutinize that procedure. And one of the things that militates against the conclusion that this is a vehicle for discrimination is just what Judge Gilman brought up initially, and that is that Christine Capitano, a female, made it to number one on the list in April of 2009. But that doesn't negate the possibility that in earlier years there was discrimination. It's certainly a permissible thing to argue, but for purposes of summary judgment, we have to give all inferences to the plaintiff about where the evidence is. But what we're looking at is this timeframe that this plaintiff alleges discrete acts under Title VII of failure to promote. And at this time, we have a female who has raised up to the number one level. Under close scrutiny, additional things just don't make sense if this is a vehicle for discrimination. They specifically brought up a battalion chief, Norm Cooper. The battalion chiefs were the individuals who had the ability to actually put the numbers on paper and give it to the chief. This is an individual, they say, has expressed this animus, and he's in a position to do this. And if you look at Battalion Chief Cooper's lists, beginning in November of 2009, for that list and the next two, he rated a woman, Tamara Peterson, number one. The suggestion is that the only reason that this plaintiff would have demoted is because the district is out there engaging in discrimination. Well, there was lots of evidence from various women who were there that talked about this is a guy's world, and they let us know all the time that that's what it is. And they say very unkind and unflattering things to us. And there are 70 or so positions, and only four of them are held by women. And, you know, why isn't that enough at the summary judgment stage? First of all, all of the evidence that came in concerning these statements that were being made were statements of her co-workers. There was no indication of any No. There's no indication that the chiefs in this case who are the decision makers and who are the ones that need to take care of this Title VII violation for a hostile work environment, which is not a That's not her claim. Her claim is she should have been promoted. She's not saying, I mean, that's her primary claim at this point. So I'm not sure why there's something wrong with having your co-workers testify under oath about how things are. Her claim is she should have been promoted to acting captain, and the evidence suggested that there was no pretext with respect to that position. Her claim is that she then should have been promoted to captain when Mr. Medina was, but there's no evidence that this was a Medina versus plaintiff or Medina versus the acting captains. This was a yes or no, high or low decision by the union members. Well, I am sympathetic to your argument that the captain, that one captain position is in a different ballpark, but I guess I have a hard time seeing why at the summary judgment stage, the lower level positions, there's not a permissible inference of pretext. If you examine the subjective nature of the preference list, there is a request without any evidence by the plaintiff that you consider that it's discriminatory in nature and that it was used discriminatorily. And what I'm telling you is that that's just not the case. A woman made it to the top of the list. The battalion chief who claims, they claim has this animus, rated women number one. And another piece of evidence, if you take a look at the April 2009 preference list, that's the one that they say showed Amy Green at a particular level and then the next one in December shows her off the list. She was tied in April of 2009 with a man named Clayton at 33 points. And Mr. Clayton did exactly the same thing she did on the next sheet. He shows up at the bottom of one. He shows up off one. He shows up higher on another one. And they both are about the same. People, I mean, the evidence is and the testimony was that people moved on these lists. And the suggestion has been that the only reason that Amy Green moved was because of discrimination. And all I'm saying is that that has not been proven. And that's not a given. I mean, the main problem I see is, though, that there's lots of evidence in the record that a lot of her male firefighters had negative stereotypes and comments about females in the fire department. And there's evidence in the record that the rank and file don't like women in the fire department. There is evidence in the record that some of the firefighters had problems. They've been, this is a 70-person firefighting group. And so this is a small percentage. This is not unusual to ask the firefighters to provide their input with respect to people in a dangerous profession that they're going to have to be working with in a small team. There were discussions about that in the record. You know, these are teams. And so you have a combination of objective and subjective. That's why when Chief Lee's was deposed, he said, we sit down and we talk about performance. And then we Well, it's true that it isn't inherently or per se discriminatory or retaliatory to rely on subjectivity. But if 10 out of 70 express discriminatory attitudes, that's not a good reference. Isn't that enough to at least allow an inference that there is a significant effect on the prioritized list? And those 10 that have been identified, in terms of discriminatory animus, there's a real question about whether calling Ms. Green some of the names they did simply indicated that they didn't like her versus they had some type of gender bias. I agree with you. It's a question of fact for the jury. Why did they do it? But I don't see why that's a subject for summary judgment. I guess that's my issue. I understand your argument, and tell me if there's more to it. But as I understand your argument, it's that the fact that these subjective lists produce women at the top suggests that it couldn't be the case that all of these rank-and-file people had an across-the-board animus toward women in general, because if that were true, a woman would never be at the top. So it must have been something personal to this particular plaintiff. That's part of it, plus the additional. If there's a battalion chief out there, they say has the animus because he says the things that they're listing, and then he goes and rates a woman number one three times in a row, that suggests against the argument that this woman is being discriminated or this system is being used to discriminate against her. Okay. But isn't the reason that might be particular to this plaintiff as to why she's dropping is because she had the audacity to apply for this position that everyone then resented her for and doesn't – and in part, the reason they're resenting her is because they don't think a woman should be – should rise to that rank. Doesn't that sort of still involve discriminatory animus? That's not what the evidence is, Your Honor. The evidence was that people resented her because she was a rookie. She was a reserve who had the audacity to think she could jump the queue and go from no experience at a fire to a captain on a fire truck. Well, if that were true, though, then the comments would be I'm not taking orders from a rookie. The comments were I'm never going to take orders from a woman. She should get back in the kitchen or do whatever, right? So that's not consistent with what you're saying. And that's not all of the comments, no. One or two, perhaps. There's a suggestion, too, that the union in this case had some input and that these were the same type of firefighters who were working with the plaintiff. I just point out that in terms of the union involvement, we have no evidence as to exactly how they prepared their lists, what kind of votes they took. There was one reference that there were some discussions or conversations at the union level. I would just point out to you that even if the union on all of these subsequent occasions had rated the plaintiff number one, she still would not have made the list high enough on the list to get promoted. Even if she had continually been she would not have made it to the point where she would have gotten an offer. And the position is that this is just there's a lot there, but it's just not material. Thank you, counsel. Mr. Bonet, you have a little bit of rebuttal time remaining. Thank you, Your Honor. I would direct the court's attention to the Dominguez Curry decision, which we've cited both in our opening brief and in our reply brief for the proposition that it doesn't matter whether Chief Benbow or Chief Alexander harbored individual discriminatory animus or even knew, for that matter, if any of the other firefighters harbored improper discriminatory animus. And the language in particular on page 1040 of the opinion that I would particularly direct the court's attention to is it reads, Quote, Thus contrary to the district court's conclusion, evidence of Stacey's discriminatory remarks, that was the subordinate, to permit a jury to find that animus affected the ultimate hiring decision, even if Stacey never communicated his bias to Eliguchi, and even if Eliguchi himself was not biased against women. And I think that responds to one of the questions that one of you asked. Again, remember that the also pretext can be established here through the shifting explanations that have been presented. Out of the gate, one of the first things that was mentioned to Ms. Green was, well, there are some financial considerations vague, never clearly articulated what they were, but never mentioned in the EEOC position statement that was submitted. And later, during the 30B6 deposition, when Chief Alexander, the designee, was asked about the budgetary consideration, couldn't even articulate what those were. The jury on those facts alone certainly could make a determination that the shifting explanations demonstrate that there is a pretext. Finally, the last comment I'd like to make is it isn't just the rank and file who could be construed as evidencing bias. Even the evaluators themselves at the assessment center use terminologies like she's too easily rattled, must control her emotions, must gain composure over her emotions. Those are not terms that are used to describe men. Those are terms that are used to describe women. They were based on her performance during the assessment part of that exam, right? And I think from what I remember from how the performance went down, there was some basis for them to make those comments. And I think your client acknowledged that she, there was a run-in with her supervisor from the other employer, and that might have affected how she did. That's true, Judge Wofford. But my point is making an observation that someone didn't answer well, someone didn't show confidence, someone didn't give the correct answer is the kind of thing one would expect from an objective evaluation. And what I'm saying is there are cases to talk about, and certainly I'm sure the catchphrases like get a control of her emotions. We don't hear those things about men. And if that's standing alone... Am I remembering right that she cried at one point during that? I think there was some testimony that she was concerned about the fact that all of a sudden on the second day of the assessment center, her current full-time employer show up, and so she thought these male firefighters had tipped them off. And so, yeah, she was upset about it. And I think there was evidence that she was at one point seen by Brenda Trankina crying in the women's restroom, but not in, there's no evidence that she was crying in front of any of the evaluators. And even Ms. Trankina gave conflicting testimony about whether Ms. Green actually admitted that she lied or whether she just, Ms. Trankina just concluded that she had lied. So... I'm just saying, I just didn't think this was the strongest point for you to come back with on the problem. It isn't. We have other evidence to work with. And if this was all we had to hang our hat on, Your Honor, I think it would be, but I think it shouldn't be overlooked in conjunction with the context of all the other evidence. And that was the point I wanted to make. Thank you, counsel. The case just argued is submitted. Again, we appreciate both of your arguments. And for this session, we are adjourned. All rise. This court for this session stands adjourned.
judges: Gilman, Graber, Watford